### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

WESTERN WORLD INSURANCE COMPANY,

    Plaintiff,         Case No. 05-72573

v.                 Hon. Gerald E. Rosen

LULA BELLE STEWART CENTER, INC.,
KARL TROY, MARILYN KARI, SUTLANA
SAMI, and STEPHANIE ALSTON, as Next Friend
of STEPHEN ALSTON,

    Defendants.

_____/

### OPINION AND ORDER REGARDING
### CROSS-MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on   February 9, 2007    

PRESENT:  Honorable Gerald E. Rosen
       United States District Judge

## I.  INTRODUCTION

In the present action, Plaintiff Western World Insurance Company seeks a

declaration that it is liable for a maximum of $100,000 in insurance coverage under a

series of annual commercial general liability policies it issued to Defendant Lula Belle

Stewart Center, Inc., a foster care agency.  In an underlying tort suit, Defendant Stephanie

Alston, as next friend of her son Stephen Alston, has alleged that Defendant Lula Belle

and three of its employees or agents, Defendants Karl Troy, Marilyn Kari, and Sutlana

Sami, negligently or wrongfully placed Stephen in a foster home with another child who allegedly was known to be a sexual predator, and then failed to provide proper supervision or take appropriate remedial action when Stephen was repeatedly raped by the other child over a seven-week period.[1]  Plaintiff does not dispute that it is obligated to provide coverage to Defendant Lula Belle under a "sexual molestation" endorsement to the policies it issued to the foster care agency, but it maintains that this coverage is subject to a $100,000 maximum amount that is payable for each "claim."

Through the present cross-motions, Plaintiff and Defendant Alston seek summary judgment as to whether this $100,000 limit applies, or whether the Plaintiff insurer instead is obligated to pay up to an aggregate limit of $300,000 under each of the two successive policies that were in effect during the seven-week period when the alleged acts of molestation occurred.  Plaintiff argues that coverage is available only under the policy that was in effect when Stephen Alston was first molested by another foster care child, and that all subsequent acts of molestation by this same child are part of a single "claim" to which the policy's $100,000 per-claim limit applies.  Defendant, for her part, contends that coverage is available under any policy in effect at the time that an act of molestation occurred, and she further asserts that each such act of molestation qualifies as a separate

---

[1]This underlying suit was initially brought in state court, but has since been superseded by a federal court action in which Defendant Alston has asserted claims under 42 U.S.C. § 1983 and various state law claims.  This case, No. 05-72749, subsequently was reassigned to the undersigned as a companion to the present action.

2

"claim" with its own $100,000 limit.[2]

These cross-motions have been fully briefed by both sides.  Having reviewed the parties' briefs, the accompanying exhibits, and the record as a whole, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide the parties' motions "on the briefs."  See Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan.  This opinion and order sets forth the Court's rulings.

## II.  FACTUAL BACKGROUND

### A.    The Allegations of the Underlying Tort Suit Brought by Defendant Alston

For present purposes, the parties accept as true the allegations made by Defendant Stephanie Alston in her underlying tort suit against Defendant Lula Belle Stewart Center, Inc., and three of its employees or agents, Defendants Karl Troy, Marilyn Kari, and Sutlana Sami.  As noted, this underlying suit stems from repeated sexual assaults upon Stephen Alston, who was six years old at the time, while he resided in a foster home

---

[2]Apart from these cross-motions, Plaintiff has moved for summary judgment or entry of a default judgment as to Defendant Sultana Sami, the foster care mother in whose care Stephen Alston was placed at the time of his alleged molestation by another foster child.  In support of this motion, Plaintiff argues that it is not obligated to provide coverage for any acts or omissions of Defendant Sami herself, but only to the extent that Sami is being held responsible for the acts or omissions of the Lula Belle foster care agency.  As Plaintiff acknowledges, however, Defendant Sami has yet to file an answer to the complaint or otherwise appear in this action, nor has she appeared in the underlying tort suit brought by Defendant Alston.  Accordingly, the Court elects to await a clerk's entry of default against Defendant Sami under Fed. R. Civ. P. 55(a), after which it will entertain a renewed motion for default judgment under Fed. R. Civ. P. 55(b)(2).

where he had been placed by Defendant Lula Belle, an agency that contracted with Wayne County, Michigan to provide foster care services for abused or neglected children who have been removed from their homes by the State.

According to the first amended complaint in this underlying suit, on March 23, 2002, Stephen Alston and his siblings were removed from the home of their mother, Defendant Stephanie Alston, because of neglect, and were made temporary wards of the court. Stephen was assigned to the Lula Belle foster care agency for placement, and Defendant Marilyn Kari, a supervisor at the agency, was in charge of arranging this placement. Defendant Kari, in turn, designated Defendant Karl Troy as the case manager for Stephen.

On March 24, 2002, Stephen was placed in the foster care home of Defendant Sutlana Sami. At the time, two other foster children, twelve-year-old and seven-year-old boys, also resided in this foster home. According to the complaint, the twelve-year-old had a history of sexual abuse and sexual aggression toward other children. Despite the specific knowledge of Lula Belle employees of the risk that Stephen would be sexually assaulted by this twelve-year-old boy, he nonetheless was placed in the home of Defendant Sami.

Between March 24, 2002 and May 14, 2002, Stephen was sexually assaulted by the twelve-year-old boy on a regular basis, with these assaults occurring on several days throughout this period and with Stephen suffering injuries from each such incident. At one point during this period, Defendant Alston allegedly informed Defendant Troy that

4

her son was being raped by another foster child, but Defendant Troy allegedly dismissed this report without any investigation.  Ultimately, when Defendant Sami became aware that Stephen had been assaulted, he was removed from the home on May 14, 2002 and placed with his grandmother.

Based on these allegations, Defendant Alston has asserted a variety of federal and state-law claims against Defendants Lula Belle, Kari, Troy, and Sami.  In support of these claims, Defendant Alston alleges that the foster care agency and its employees and agents were negligent, if not deliberately indifferent, in their placement of Stephen with a known sexual predator, their failure to properly monitor or supervise the foster children in Defendant Sami's home while Stephen remained in this placement, and their failure to provide appropriate treatment following the multiple sexual assaults on Stephen by another foster child.

## B.  The Relevant Provisions of the Commercial General Liability Policies Issued By Plaintiff to the Defendant Foster Care Agency.

Through the present suit, Plaintiff Western World Insurance Company seeks a declaration of the extent of its obligation to provide coverage as to the claims asserted by Defendant Alston in the underlying tort suit described above.  As noted at the outset, Plaintiff acknowledges, at least for present purposes, that it is obligated to provide coverage up to a $100,000 per-claim limit for the series of sexual assaults committed against Stephen Alston while he was under the care of the Lula Belle foster care agency , but it denies that the pertinent policies provide any coverage beyond this amount.

5

At all pertinent times in the period between March 24 and May 14, 2002, the Lula Belle foster care agency was insured under a commercial general liability ("CGL") policy issued by the Plaintiff insurer. These policies had twelve-month terms, with one policy expiring in the middle of the relevant time period, on April 10, 2002, and a successor policy taking effect immediately thereafter. So far as the record reveals, these two policies are materially indistinguishable.[3]

Among the policy's various exclusions, one such provision states that "no coverage exists for claims or suits brought against any insured for damages arising from sexual action." (First Amended Complaint, Ex. C, 4/10/2001 Policy, Sexual Action Exclusion at 1.)[4] This same provision defines "[s]exual action" as "includ[ing], but not limited to, any behavior with sexual connotation or purpose," and states that "this exclusion applies even if an alleged cause of the damages was the insured's negligent hiring, placement, training, supervision, act, error or omission." (Id.)

Another portion of the policy, however, gives back some of the coverage that is excluded in the above-cited provision. Specifically, the policy includes a "sexual molestation" endorsement, under which the Plaintiff insurer is obligated to "pay those

---

[3]Thus, the Court generally will refer to the "policy" in the singular, except as necessary to distinguish between the two policy terms that spanned the relevant time period in the spring of 2002.

[4]Unfortunately, the policy at issue consists of a collection of separate documents rather than a single series of consecutively numbered pages. In citing to individual policy provisions, therefore, the Court will refer to the relevant policy subpart and the page number within this subpart.

sums the insured becomes legally obligated to pay as damages because of any 'molestation'[] to which this insurance applies."  (<u>Id.</u>, Sexual Molestation Insurance Endorsement at 1.)  Under this endorsement, "molestation" is defined as "any action with sexual connotation or purpose resulting in bodily or mental injury."  (<u>Id.</u>)  For present purposes, at least, all are agreed that the sexual assaults allegedly committed against Stephen Alston constitute "molestations" within the meaning of this endorsement.

In their dispute concerning the extent of Plaintiff's obligation to provide coverage to the Lula Belle foster care agency in the underlying tort suit brought by Defendant Alston, the parties focus principally upon two provisions within the "sexual molestation" endorsement.  First, the endorsement provides that it "applies to damages from 'molestation' only if:  (1) The 'molestation' takes place in the 'coverage territory'; [and] (2) The 'molestation' first occurs during the policy period."  (<u>Id.</u>)  Next, the endorsement amends the general "Limits of Insurance" section of the standard CGL policy by stating (i) that "[t]he Each Claim limit" — defined elsewhere in the endorsement as $100,000 — "is the most we will pay for each claim or suit for damages due to 'molestation,'" and (ii) that "[t]he Aggregate Limit" — defined elsewhere in the endorsement as $300,000 — "is the most we will pay because of all damages due to 'molestation.'"  (<u>Id.</u> at 2.)

7

## III. <u>ANALYSIS</u>

**A.     The Standards Governing the Parties' Cross-Motions**

Through the present cross-motions, Plaintiff and Defendant Alston each seek a ruling as a matter of law on the question whether the policies issued to the Lula Belle foster care agency limit coverage to a maximum of $100,000 for all of the claims asserted in Defendant Alston's underlying tort suit, or whether this coverage extends to $200,000 — $100,000 for each of the two policies in effect during some portion of the seven-week period that Stephen Alston was sexually assaulted by another foster child — or perhaps $600,000 — twice the $300,000 aggregate limit under each of these two policies. Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The principal issue addressed in the parties' cross-motions concerns the proper interpretation of the policy's "sexual molestation" endorsement. This is a question of law, and hence is amenable to resolution under summary judgment principles unless the pertinent policy language is found to be ambiguous. See <u>Klapp v. United Insurance Group Agency, Inc.</u>, 468 Mich. 459, 663 N.W.2d 447, 451, 453-54 (2003).[5] "The principles of construction governing other contracts apply to insurance policies," and

---

[5]The parties evidently agree that Michigan law governs the Court's substantive inquiry in this case.

8

"[w]here no ambiguity exists, this Court enforces the contract as written." <u>Farm Bureau</u>
<u>Mutual Insurance Co. v. Nikkel</u>, 460 Mich. 558, 596 N.W.2d 915, 919 (1999).

**B.      Because Stephen Alston Was the Victim of Multiple Acts of Sexual**
**Molestation Spanning Two Policy Periods, Each of the Policies in Effect**
**During This Time Frame Is Available to Provide Coverage in the Underlying**
**Tort Suit Brought on Stephen's Behalf.**

In seeking summary judgment in its favor, the Plaintiff insurer argues that its
obligations to the Lula Belle foster care agency are limited by two separate policy
provisions.  First, Plaintiff points to language in the policy's "sexual molestation"
endorsement stating that the insurance provided under this endorsement "applies to
damages from 'molestation' only if . . . [t]he 'molestation' first occurs during the policy
period."  (First Amended Complaint, Ex. C, 4/10/2001 Policy, Sexual Molestation
Insurance Endorsement at 1.)  Since the series of molestations of Stephen Alston by
another foster child "first occur[red]" during the policy period spanning from April 10,
2001 to April 10, 2002, Plaintiff contends that this policy alone, and not the successor
policy that commenced on April 10, 2002, provides coverage for any damages the Lula
Belle agency must pay as a result of these molestations.  The Court cannot agree.

At first glance, Plaintiff's argument appears to comport with the pertinent policy
language.  The sexual molestation endorsement, after all, expressly limits coverage to
molestations that "first occur[]" during a policy period.  Moreover, the sexual assaults
allegedly suffered by Stephen Alston are readily viewed as related, where each occurred
within a relatively brief period spanning from March 24 to May 14, 2002, the same

perpetrator committed each assault, and each of these incidents took place in the foster care home of Defendant Sutlana Sami.  Accordingly, Plaintiff reasons that this series of molestations "first occur[red]" during the April 2001-April 2002 policy period, and that this policy is the sole source of coverage for any damages arising from these molestations.

Yet, Plaintiff's argument rests on a premise that is not supported — and, indeed, is contradicted — by the language of the policy read as a whole.  First, and most importantly, the event that must "first occur[] during the policy period is a "***molestation***," referred to in the singular.  A "molestation," in turn, is defined as "any ***action*** with sexual connotation or purpose resulting in bodily or mental injury," (Sexual Molestation Insurance Endorsement at 2 (emphasis added)) — a definition which, once again, seemingly contemplates a single event rather than a series of related incidents.  As Defendant Alston points out, while some of the acts of molestation against Stephen Alston "first occur[red]" during the April 2001-April 2002 policy period, the later such incidents "first occur[red]" during the separate April 2002-April 2003 policy period.  It seemingly follows, as Defendant Alston contends, that each such molestation "first occur[red]" on the specific date upon which Stephen Alston was victimized by a discrete "action with sexual connotation or purpose," with each of these incidents triggering coverage under the policy in effect at the time.

Where, in contrast, Plaintiff sought to provide coverage for a series of related incidents as a single "occurrence," it said so specifically and unambiguously in the language of the policy itself.  In particular, in the main portion of the CGL policy issued

10

to Lula Belle, an "[o]ccurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (First Amended Complaint, Ex. C, 4/10/2001 Policy, CGL Coverage Form at 12.)  The policy then provides that "[t]his insurance applies to 'bodily injury' and 'property damage' only if: (1) [t]he 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and (2) [t]he 'bodily injury' or 'property damage' occurs during the policy period."  (Id. at 1.)  Under the main portion of the policy, therefore, a series of related incidents, arising from "continuous or repeated exposure to substantially the same general harmful conditions," will be treated as a single "occurrence" for purposes of determining the existence and extent of coverage.

Notably, however, no such notion of "relatedness" can be found within the sexual molestation endorsement that is the source of coverage in this case.  Indeed, the word "occurrence" does not appear *anywhere* in this endorsement.  Instead, coverage is triggered if a "'*molestation*' first occurs during the policy period," and, as noted, the endorsement's definition of "molestation" does not extend to a series of related incidents.  Thus, while Plaintiff correctly observes that the sexual molestation endorsement must be construed in light of the overall CGL policy of which it is a part, (see Plaintiff's Motion, Br. in Support at 4), the policy's broad definition of an "occurrence" cannot possibly assist Plaintiff here if this term is not even *used* in the sexual molestation endorsement.  Rather, under traditional principles of contract interpretation, the endorsement's specific provisions, where applicable, would govern over the policy's more general terms.  See

11

Wait v. Newman, 284 Mich. 1, 4, 278 N.W. 742, 743 (1938).  Accordingly, a "molestation" within a policy period triggers coverage under that policy, even if this molestation might otherwise qualify, under the more general terms of the standard CGL policy, as part of a single "occurrence" that originated in an earlier policy period.

This absence of any notion of "relatedness" in the sexual molestation endorsement serves to distinguish this case from others in which the courts have treated a series of molestations as a single "occurrence."  In TIG Insurance Co. v. Smart School, 401 F. Supp.2d 1334, 1339-40 (S.D. Fla. 2005), for example, the policy at issue provided coverage in the event that a "sexual abuse occurrence" took place "[d]uring the policy period."  The policy defined a "sexual abuse occurrence" as encompassing "[a] single act, or multiple, continuous, sporadic, or related acts of sexual abuse or molestation caused by one perpetrator, or by two or more perpetrators acting together," and it further provided that "[i]f the 'sexual abuse occurrence' consists of a series of related acts of sexual abuse or molestation, the 'sexual abuse occurrence' shall be deemed to have taken place on the date of the first of such series of acts."  TIG Insurance, 401 F. Supp.2d at 1340.  Under these circumstances, the court found that the policy unambiguously dictated that all of the acts of sexual misconduct perpetrated by the same teacher while employed at the defendant school constituted a single "sexual abuse occurrence," "regardless of the individual circumstances pertaining to each act" that comprised this "occurrence."  401 F. Supp.2d at 1343.  Plainly, the policy in this case lacks any analogous language specifying that related acts of sexual molestation should be treated as a single "occurrence."

12

Notably, even in cases where insurance policies have defined an "occurrence" as encompassing a series of related acts, the courts generally have held that ongoing sexual abuse or exposure to harmful conditions that causes discrete injuries in multiple policy periods triggers coverage under each of the policies in effect during this time span.  In one such case, Society of Roman Catholic Church of Diocese of Lafayette & Lake Charles, Inc. v. Interstate Fire & Casualty Co., 26 F.3d 1359, 1363-64 (5th Cir. 1994), the policy defined an "occurrence" as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally result in personal injury, or damage to property during the policy period," and it further provided that "[a]ll such exposure to substantially the same general conditions existing at or emanating from one location shall be deemed one occurrence."  Applying this language in a case where two priests were accused of molesting thirty-one children over a seven-year period, the court held that the damage to each child constituted a separate "occurrence."  Diocese of Lafayette & Lake Charles, 26 F.3d at 1364.  The court then reasoned:

> When a priest molested a child during a policy year, there was both bodily injury and an occurrence, triggering policy coverage.  All further molestations of that child during the policy period arose out of the same occurrence.  When the priest molested the same child during the succeeding policy year, again there was both bodily injury and an occurrence.  Thus, each child suffered an "occurrence" in each policy period in which he was molested.

26 F.3d at 1365 (citations omitted); see also Stonewall Insurance Co. v. Asbestos Claims Management Corp., 73 F.3d 1178, 1194-97 (2d Cir. 1995); Interstate Fire & Casualty Co. v. Archdiocese of Portland, 35 F.3d 1325, 1329-30 (9th Cir. 1994); Diocese of Winona v.

Interstate Fire & Casualty Co., 858 F. Supp. 1407, 1420-22 (D. Minn. 1994), amended on

reconsideration, 916 F. Supp. 923, 928-29 (D. Minn. 1995), aff'd in part and rev'd on

other grounds, 89 F.3d 1386 (8th Cir. 1996); Roman Catholic Diocese of Joliet, Inc. v.

Interstate Fire Insurance Co., 685 N.E.2d 932, 938-39 (Ill. App. Ct. 1997).[6]

      In this case, it is not necessary to decide whether the policy's definition of an

"occurrence" would limit coverage solely to the policy in effect at the time of the first

exposure to an ongoing harmful condition, or whether coverage would be available under

each policy in effect at any point during a repeated exposure to the same condition.  Such

an inquiry is required only if the availability or extent of coverage turns upon the

relatedness of the underlying events, acts, or conditions that resulted in injury.  Here, in

contrast, the sexual molestation endorsement lacks any language that might link multiple

sexual assaults into a single "occurrence."  Although Plaintiff clearly knew how to draft

such language — and, in fact, included such a definition of an "occurrence" in the main

portion of its CGL policy — it notably failed to specify in the sexual molestation

endorsement that an ongoing, related series of sexual assaults would be covered as a

single "occurrence."   Under these circumstances, Plaintiff has failed to identify any

policy language that would preclude coverage in a subsequent policy period for a series of

related molestations that began in an earlier period.  Rather, coverage is triggered so long

---

      [6]Indeed, Plaintiff itself acknowledges the "general rule" that "when an insured molests a child multiple times in multiple policy years, multiple exposures in a single year constitute one occurrence during each policy period, but the occurrences in multiple years trigger[] coverage in each policy in effect."  (Plaintiff's Motion, Br. in Support at 11.)

as a discrete act qualifying as a "molestation" "first occurs during the policy period."

To be sure, there is a distinction between policy language dictating that a molestation must "occur" in a policy period and the policy language actually used here, which provides coverage only if the molestation "*first* occurs" during the policy period. The additional word "first" is suggestive, at least, of an event that spans a period of time, and that is capable of commencing prior to a policy period and continuing into this period. Accordingly, the Court should be reluctant to adopt a construction of the policy that strips the word "first" of any meaning or purpose. See Century Surety Co. v. Charron, 230 Mich. App. 79, 583 N.W.2d 486, 488 (1998) (explaining that a court "should read the contract as a whole and give meaning to all the terms contained [in] the policy").

For two reasons, however, the Court is unable to conclude that the "first occurs" language permits multiple acts of molestation to be treated as a single "occurrence" that triggers coverage only under the policy in effect at the time of the first such molestation. First, in its effort to give meaning to all of the policy's terms, the Court is not at liberty to ignore one portion of the policy at the expense of another, or to deviate from the policy's express definitions of its own terms. While one ordinarily would expect the phrase "first occurs" to be associated with events that span a period of time, rather than discrete incidents, the policy provision at issue here uses this phrase in connection with an act, molestation, that is defined in the singular. Absent any indication that "molestation" can encompass a series of related acts, the policy's inelegant and confusing reference to the

time at which a molestation "first occurs" cannot overcome the explicit definition of
"molestation" as "any ***action*** with sexual connotation or purpose resulting in bodily or
mental injury." And, even if this definition could be construed as embracing both discrete
acts of sexual abuse and a series of related incidents of sexual molestation, the
endorsement provides no clue as to how the requisite degree of "relatedness" is to be
determined. At best, then, the policy's reference to the point at which "[t]he 'molestation'
first occurs" is ambiguous, and this ambiguity must be resolved against the Plaintiff
insurer as the drafter of the policy language at issue. See Wilkie v. Auto-Owners
Insurance Co., 469 Mich. 41, 664 N.W.2d 776, 787 (2003); Cincinnati Insurance Co. v.
Federal Insurance Co., 166 F. Supp.2d 1172, 1177 (E.D. Mich. 2001).

Next, and more importantly, Defendant Alston persuasively argues that the
endorsement's "first occurs" language is a term of art, specifying the means by which
coverage is triggered under the policy. As the Michigan Supreme Court observed, in a
case presenting the question of which policy covered the environmental clean-up costs of
groundwater contamination that was not discovered until years after it occurred:

> Courts and commentators have discussed four possible theories for
> determining what event or events trigger coverage under standard CGL
> policies. These are the "exposure," "injury in fact," "manifestation," and
> "continuous" trigger theories. These various theories are relevant to the
> question when an occurrence takes place for purposes of determining if
> there is coverage under a particular insurance policy.
>
> The exposure trigger places the "occurrence" at the earliest time, i.e.,
> when the exposure to injury-causing conditions occurs. In the
> environmental pollution context, this is the date on which the pollution
> began. The manifestation theory places the "occurrence" at the latest

16

possible time, i.e., when the property damage is ultimately discovered.
Some courts describe this trigger as being when the injury manifests itself
in the form of ascertainable property damage.  The trigger under the injury-
in-fact approach is actual property damage.  Under this theory, the finder of
fact must determine when exposure to the pollutants resulted in actual
property damage in the facts of a given case.  The final theory, known
alternatively as the "continuous," "triple," or "multiple" trigger, holds that
the injury occurs continuously from exposure until manifestation.  Thus, all
insurers who assumed risk from the initial pollution through discovery of
property damage would be liable.

Gelman Sciences, Inc. v. Fidelity & Casualty Co., 456 Mich. 305, 572 N.W.2d 617, 621

(1998) (citation and footnote omitted), overruled on other grounds by Wilkie, supra, 664

N.W.2d 776.

In Gelman Sciences, the policies at issue provided coverage for bodily injury or

property damage "caused by an occurrence," and an "occurrence," in turn, was defined as

an "accident, including injurious exposure to conditions, which results during the policy

period, in bodily injury or property damage neither expected nor intended from the

standpoint of the insured."  Gelman Sciences, 572 N.W.2d at 623.  The Court held that

"according to the policies' explicit terms, actual injury must occur during the time the

policy is in effect in order to be indemnifiable, i.e., the policies dictate an injury-in-fact

approach."  572 N.W.2d at 623.  Applying this "injury-in-fact" theory of coverage to the

facts of the cases before it, the Court concluded that coverage existed in each policy

period during which the release of groundwater contaminants resulted in property

damage.  572 N.W.2d at 627-28.

Returning to the present case, Plaintiff acknowledges in its motion that the policy's

"first occurs" language mandates an occurrence-based rather than "claims made" trigger of coverage, thereby precluding coverage for injuries that manifest themselves during the policy period but are caused by acts that predate the policy period. (See Plaintiff's Motion, Br. in Support at 4.) In the parlance of Gelman Sciences, the policy adopts an "injury-in-fact" approach to determining whether or when coverage is triggered. As observed in a leading insurance law treatise, the injury-in-fact theory "holds that coverage is triggered when real personal injury or actual property damage *first occurs,* regardless of whether that damage or injury is ascertainable at the time." 7 Couch on Insurance § 102:22 (3d ed. 2006) (emphasis added); see also Dow Chemical Co. v. Associated Indemnity Corp., 724 F. Supp. 474, 478 (E.D. Mich. 1989) ("If coverage is triggered when real personal injury or actual property damage *first occurs,* the approach is called the 'injury in fact theory.'" (emphasis added)). Accordingly, the "first occurs" language in Plaintiff's policy is not superfluous, but instead establishes that coverage is triggered under an injury-in-fact approach rather than some other competing theory.

As the courts have recognized, this coverage-triggering inquiry is analytically distinct from the question whether a policy treats a series of related acts or incidents as one or multiple occurrences. In TIG Insurance, supra, for instance, the court noted that "numerous cases involving occurrence policies" had "ma[d]e a distinction between the issue of whether and under what policy particular claims are covered versus the issue of whether, if there is coverage, the claims amount to more than one occurrence." 401 F. Supp.2d at 1347 (collecting cases). Similarly, in a case "present[ing] the question of what

18

constitutes a separate 'occurrence'" under the policies at issue, the Sixth Circuit repeatedly emphasized that the portions of the policies addressing coverage-triggering issues — *i.e.,* that specified "*when* and *where* an occurrence must take place for . . . coverage to exist" — had no bearing on the distinct question of "the *number* of occurrences." Michigan Chemical Corp. v. American Home Assurance Co., 728 F.2d 374, 378, 381-82 (6th Cir. 1984); see also Diocese of Winona, 858 F. Supp. at 1421 ("An issue distinct from whether coverage is triggered in a particular policy period is the number of occurrences the abuse constitutes."). Consistent with this distinction, the Court concludes that the "first occurs" policy language in this case is intended to address the trigger-of-coverage issue, and has no bearing upon the separate question whether a series of related acts of molestation should be treated as one or multiple occurrences.

Moreover, Defendant Alston correctly points out that Plaintiff's proposed reading of the sexual molestation endorsement's "first occurs" language would render another portion of the endorsement wholly superfluous — a construction which, as noted earlier, is generally to be avoided. See Century Surety, supra, 583 N.W.2d at 488. In Plaintiff's view, this language mandates a "first encounter" rule, under which "only the polic[y] in effect at the time [Stephen Alston] was first abused would be triggered," with this policy "cover[ing] all of the damage he suffered, regardless of when it arose" and subject to the policy's coverage limits. Diocese of Winona, 858 F. Supp. at 1421; see also TIG Insurance, 401 F. Supp.2d at 1348-49 (discussing the first encounter rule and concluding that the policies in that case called for the application of this rule).

19

Yet, a separate exclusion within the sexual molestation endorsement expressly adopts such a "first encounter" rule, at least for an identified subclass of perpetrators. Specifically, this exclusion provides that no coverage is available for "the molestation of any person by the named insured or family member of the named insured *which predates the inception of this policy and continues into the policy period*." (Sexual Molestation Insurance Endorsement at 2 (emphasis added).) If, as Plaintiff contends, the endorsement's "first occurs" language precludes coverage for *any* series of related molestations by *any* perpetrator that commenced prior to the policy period, then no *separate* exclusion would be necessary to avoid coverage for such a series of molestations committed "by the named insured or family member of the named insured." If this additional exclusion is to have any meaning or purpose, Plaintiff's proposed construction of the endorsement's "first occurs" language cannot be correct.

Nonetheless, in one final effort to persuade the Court that the multiple acts of sexual molestation committed against Stephen Alston should be viewed as a single "occurrence" that is covered only under the first of the two successive policies issued to Lula Belle, Plaintiff asserts that such treatment is warranted because these multiple incidents purportedly stemmed from a single "cause." Under Plaintiff's reading of the complaint in the underlying suit brought by Defendant Alston, it was the negligent or deliberately indifferent placement of Stephen Alston in the same foster home as a known sexual predator that led to Stephen's molestations and injuries. Yet, as a threshold matter, Defendant Alston points out that this overlooks the allegations in the underlying

20

complaint that the Lula Belle foster care agency and its agents failed to provide proper monitoring or supervision *after* placing Stephen in the same home as a known sexual predator, resulting in repeated sexual assaults and additional injuries before anyone learned what was happening.  As one court has recognized, such allegations of improper supervision and disregard of known risks can be consistent with a finding of multiple acts of negligence or deliberate indifference — and, hence, multiple causes for resulting injury — because "the decision not to supervise may be revisited now and again" and each additional warning triggers a renewed duty to act.  Lee v. Interstate Fire & Casualty Co., 86 F.3d 101, 104-05 (7th Cir. 1996).  At the present juncture, then, where the parties have agreed to accept as true the allegations in Defendant Alston's underlying complaint, the Court cannot say as a matter of law that the repeated molestations suffered by Stephen Alston all stemmed from a single cause.

But this issue of causation ultimately is beside the point here, because coverage under the policy simply *does not depend* upon the theory of wrongdoing advanced against Lula Belle and its agents.  Rather, Plaintiff agreed in the sexual molestation endorsement to "pay those sums the insured becomes legally obligated to pay as damages *because of any 'molestation'*, to which this insurance applies."  (Sexual Molestation Insurance Endorsement at 1 (emphasis added).)  Thus, it is *molestation* that triggers coverage under the endorsement, regardless of the theory under which the Lula Belle agency might be deemed legally responsible for this molestation, and regardless of whether a single act of negligence or deliberate indifference by the agency might have

21

resulted in several incidents of molestation.  See Archdiocese of Portland, supra, 35 F.3d at 1329-30 (rejecting a similar contention that a priest's multiple acts of sexual molestation should count as only a single "occurrence" because all of these acts purportedly stemmed from the negligent supervision of the priest).

Consequently, the existence of one or multiple causes for Stephen Alston's repeated molestations simply has no bearing upon the question whether this series of molestations triggers coverage under one or both of the policies in effect during the relevant time period.  Rather, this question is controlled by the policy's definition of "molestation," along with its requirement that a molestation must have "first occur[red] during the policy period."  As explained, the Court construes these provisions as triggering coverage under each policy in effect at the time of a distinct "molestation." Under the allegations of Defendant Alston's underlying complaint, then, Plaintiff must provide coverage under each of the two policies in effect during the period between March 24 and May 14, 2002 when Stephen Alston allegedly was repeatedly molested by another foster care child.

**C.    The Amount of Available Coverage Under Each Policy Is Capped by the $100,000 Limit Per Claim or Suit for Damages.**

Apart from contending that the sexual molestations of Stephen Alston trigger coverage under only the first of the two policies in effect at the time of these molestations, Plaintiff further asserts that its obligation under these policies is limited to the $100,000 maximum set forth in the sexual molestation endorsement as "the most we

22

will pay for each claim or suit for damages due to 'molestation.'" (Sexual Molestation Insurance Endorsement at 2.) Defendant Alston, on the other hand, argues that each incident of molestation qualifies as a separate "claim," such that recovery under the Lula Belle policies is capped only by the $300,000 aggregate limit set forth in the sexual molestation endorsement. While Plaintiff's arguments in support of its position are less than compelling, the Court nonetheless is persuaded that the $100,000 limit is applicable here.

Although the parties engage in a lengthy debate concerning the proper meaning of the word "claim" as used in the sexual molestation endorsement, the necessity of addressing this question is far from clear to the Court. As noted, the endorsement expressly provides that the $100,000 "Each Claim" limit set forth on the first page of this endorsement is "the most we will pay for each claim *or suit for damages* due to 'molestation.'" (Id. (emphasis added).) Here, a single "suit for damages" has been filed against the Lula Belle foster care agency arising from the series of sexual molestations of Stephen Alston. It readily follows, in the Court's view, that the most Plaintiff must pay for Defendant Alston's underlying "suit for damages" is $200,000 — *i.e.,* the per-suit limit of $100,000 for each of the two policies in effect during the time period that Stephen Alston was being molested.[7]

_____

[7]As Defendant Alston points out, the "Limits of Insurance" portion of the main CGL policy provides that "[t]he Limits of Insurance of this Coverage Part apply separately to each consecutive annual period." (CGL Coverage Form at 8.) Thus, there seemingly is no question, and Plaintiff does not dispute, that the per-suit coverage limit of $100,000 is available under each of the two policies in effect during the relevant time period.

The Michigan Court of Appeals reached the same conclusion under analogous facts in Gibbs v. Armovit, 182 Mich. App. 425, 452 N.W.2d 839, 840 (1990).  The policy in that case provided that "[t]he company's liability for damages shall not exceed the minimum amount herein stated in any one claim or suit and subject to the same limit for each claim or suit the company's total liability, during one policy year, shall not exceed the maximum amount herein stated."  Gibbs, 452 N.W.2d at 840.  Applying this policy provision in a case where a doctor had negligently prescribed diet pills to a patient over a twenty-year period, the court held:

> We conclude that this clause is not ambiguous.  Rather, the clause clearly instructs that [the insurer] will not pay more than $200,000 for any claim or suit, which is the minimum amount under the policy, nor more than $600,000 in any one year, which is the maximum amount, regardless of how many separate claims are filed against Dr. Armovit.  Since plaintiffs have filed only one suit against Dr. Armovit, their recovery from [the insurer] is plainly limited to $200,000.

452 N.W.2d at 840.[8]  Similarly, in this case, the single suit filed by Defendant Alston triggers the $100,000 per-suit limit.

---

[8]The Court recognizes that another aspect of the ruling in Gibbs is arguably in tension with this Court's earlier determination that the series of molestations of Stephen Alston triggers coverage under each of the two policies in effect at the time.  In particular, the court in Gibbs found that Dr. Armovit's "multiple but related acts of malpractice" constituted a single "occurrence" that triggered coverage under only one of the several annual policies issued to the doctor over the relevant twenty-year period.  See Gibbs, 452 N.W.2d at 840.  The court's decision, however, does not indicate whether the policy in that case included the fairly typical language defining an "occurrence" as encompassing a series of related incidents or acts.  Moreover, the court's ruling apparently rested upon the premise that the plaintiff had suffered only a "single ascertainable injury."  452 N.W.2d at 840.  Accordingly, the Court finds Gibbs distinguishable on these points, where (i) the policy at issue here does not define "molestation" as encompassing a series of related acts, and (ii) Defendant Alston has alleged in the underlying suit that Stephen Alston suffered distinct injuries as a result of each successive sexual assault.

24

In seeking in this case to appeal to the "claim" portion of the $100,000 "claim or suit" limitation set forth in the sexual molestation endorsement, Defendant Alston evidently relies on the endorsement's use of the disjunctive "or" between "claim" and "suit." In her view, then, even if she has filed only a single "suit," the policy nonetheless provides $100,000 in coverage for each "claim" asserted in this suit. This proposition, however, is clearly at odds with the decision in Gibbs, which this Court is bound to follow unless "convinced by other persuasive data that the highest court of the state would decide otherwise." Ziebart International Corp. v. CNA Insurance Cos., 78 F.3d 245, 250-51 (6th Cir. 1996) (internal quotation marks and citations omitted). Defendant Alston has not even addressed the ruling in Gibbs, much less endeavored to explain why the Michigan Supreme Court might reach a different conclusion. Moreover, the Court sees little reason to consider whether or how the term "claim" might apply here, where the $100,000 limit per "suit for damages" is so obviously and directly applicable.

In any event, even if the endorsement limited coverage solely on a "per claim" basis, the Court's conclusion would remain the same. Admittedly, Plaintiff's position on this point — *i.e.,* that the terms "claim" and "suit" are wholly "synonymous," (Plaintiff's Motion, Br. in Support at 6) — is simply untenable, as it would violate the presumption in favor of constructions that give meaning to ***all*** of a policy's terms. See Century Surety, supra, 583 N.W.2d at 488. Indeed, the various dictionary definitions and other authorities cited by Plaintiff actually contradict its position on this point, as they indicate that a suit is merely one of many different means of advancing a "claim." And the policy itself

25

confirms this, through a definition of "suit" that nowhere even refers to a "claim."

Nonetheless, the Court cannot accept Defendant Alston's contention that each separate molestation of Stephen Alston qualifies as a distinct "claim" with its own $100,000 limit because it triggers an independent entitlement to seek a payment under the policy. Although it is true that the policy does not define the term "claim," it is evident from the way this term is used at several points in the policy that it is to be given its usual meaning under the circumstances — namely, that it is meant to encompass demands against the insured that might trigger coverage under the policy. In the main CGL policy, for example, the insured is given the duty to notify the insurer "as soon as practicable of an 'occurrence' or an offense which may result in a claim." (CGL Coverage Form at 9.) Similarly, the policy provides that "[i]f a claim is made or 'suit' is brought against any insured," the insured is obligated to "[i]mmediately record the specifics of the claim or 'suit' and the date received" and "[n]otify [the insurer] as soon as practicable." (Id.) The insured also has a duty to "[c]ooperate with [the insurer] in the investigation or settlement of the claim or defense against the 'suit.'" (Id.) It seems clear, then — and the parties apparently agree, both through the arguments they advance and the dictionary definitions and other authorities they cite — that the term "claim" in the policy refers to a demand against the insured that at least arguably triggers the policy's coverage.

While it is theoretically possible that someone in Defendant Alston's position could present each separate molestation of her son as a discrete demand against the insured foster care agency, it would be far more typical to combine a series of related,

26

temporally proximate molestations into a single demand.  And, of course, that is precisely what Defendant Alston did here, filing a single suit in which she has brought together all of the allegations, legal theories, and pleas for relief arising from the series of molestations suffered by her son between March and May of 2002.  There is no evidence that the incidents that gave rise to Defendant Alston's lawsuit were ever brought to the attention of the Lula Belle agency, whether as a "claim" or otherwise, as anything other than a series of events that triggered a right to recovery.

Moreover, as this lawsuit proceeds to trial, there is no reason to believe that a factfinder will ever be called upon to decide whether one particular alleged molestation occurred, or to determine the extent of injury inflicted by this individual assault.  Rather, Defendant Alston's case surely will be presented as a unified demand for relief based on a single series of events and injuries, albeit perhaps under several legal theories presented in the alternative.   Under these circumstances, the Court concludes that a single "claim" has been made, subject to the $100,000 limit, under each of the two policies in effect during the period that Stephen Alston allegedly was molested by another foster care child.

### IV. <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's November 7, 2005 motion for summary judgment is GRANTED IN PART and DENIED IN PART, in accordance with the rulings in this opinion and order.  IT IS FURTHER ORDERED that Defendant Alston's November 4, 2005 motion for summary judgment is GRANTED IN

27

PART and DENIED IN PART, in accordance with the rulings in this opinion and order.

Finally, IT IS FURTHER ORDERED that Plaintiff's November 9, 2005 motion for

summary judgment or default judgment is DENIED, but without prejudice to Plaintiff's

opportunity to pursue the entry of a default judgment against Defendant Sutlana Sami in

accordance with Fed. R. Civ. P. 55.


s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated:  February 9, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record
on February 9, 2007, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager

28